870 So.2d 315 (2004)
Travis COOPER, et al.
v.
LOUISIANA DEPARTMENT OF PUBLIC WORKS.
No. 03-1074.
Court of Appeal of Louisiana, Third Circuit.
March 3, 2004.
Rehearing Denied May 5, 2004.
*319 V. Russell Purvis, Jr., Smith, Taliaferro, Purvis & Boothe, Jonesville, LA, for Plaintiffs/Appellees, Travis Cooper, et al.
Julie Mobley Lafargue, Abrams & Lafargue, Shreveport, LA, for Defendant/Appellant, State of Louisiana, Department of Transportation and Development (formerly Louisiana Department of Public Works).
Court composed of BILLIE COLOMBARO WOODARD, ELIZABETH A. PICKETT, and ARTHUR J. PLANCHARD,[*] Judges.
WOODARD, Judge.
The State of Louisiana, through the Department of Transportation and Development (DOTD), formerly the Louisiana Department of Public Works, asserts that the trial court should have denied the Plaintiffs' motion for partial summary judgment because the Plaintiffs do not have a right of action against it for the permanent flooding of portions of their lands which the construction of a series of locks and dams, along the Ouachita and Black Rivers, caused. We affirm the trial court's grant of a partial summary judgment to Plaintiffs.

* * *
In 1960, the United States Congress enacted the River and Harbor Act, which authorized the construction of the Jonesville Lock and Dam and the Columbia Lock and Dam. The purpose of this construction project was to promote navigation on the Ouachita and Black Rivers by creating a navigational channel at least nine (9) feet deep and one hundred (100) feet wide at all points along these rivers.
On January 15, 1962, the State of Louisiana, through the DOTD, executed an "Act of Assurances" in conjunction with this construction project, in which it gave assurances to the United States that it would:

*320 A. Furnish free of cost to the United States all lands, easements, and right of way[s], including flowage rights in overflow areas, and suitable spoil-disposal areas necessary for construction of the project and for its subsequent maintenance, when and as required; [and]
....
C. Hold and save the United States free from damages due to construction and maintenance of the project.
In 1972, the United States Corps of Engineers (Corps) completed construction. When the subject locks and dams became operational, a pool formed in the Ouachita River, commonly referred to as the Jonesville Pool, that extended approximately 107 miles upstream to the Columbia Lock and Dam. Since its creation, the Corps has maintained the Jonesville Pool at a minimum elevation of thirty-four (34) feet above mean sea level. Previously, the water level was a minimum elevation of twenty-one and a half (21.5) feet above mean sea level. Rawson Creek flows into the Jonesville Pool. Gastis Creek and Dry Lake are tributaries of Rawson Creek.
On March 28, 1972 and at all times since this date, when the Jonesville Pool's water level rose to an elevation of thirty-four (34) feet, the water level of Rawson Creek, Gastis Creek, Dry Lake, and all the tributaries of the Ouachita and Black Rivers rose to a minimum elevation of thirty-four (34) feet above mean sea level.
On June 14, 1994, nineteen individuals, each of whom owns property along Rawson Creek, Gastis Creek, Dry Lake, Hooter Creek, Big Creek, or Oil Well Creek, filed suit against the DOTD, seeking damages for the permanent flooding of portions of their lands which the construction of these locks and dams along the Black and Ouachita Rivers caused.
Based on their assumption that the Plaintiffs' lands were within the federal navigational servitude granted to the federal government by the commerce clause of the United States Constitution, the DOTD never attempted to acquire this property before it became inundated. It, also, never offered to pay any compensation of any type to Plaintiffs as consideration for the taking or damaging of their lands.
In their petition, the Plaintiffs requested that the trial court grant them the following relief: (1) a declaration that these constructions interfere with their servitude of drainage; (2) an injunction, directing the DOTD to remove or make modifications to these constructions that obstruct natural drainage to permit the natural flow of surface waters from their estates; (3) compensation for the unlawful taking of their lands by means other than expropriation proceedings and for the resulting damage to these lands; and (4) alternatively, if it is determined that they are not entitled to removal or modification of this obstruction, they are due compensation for the loss of their servitude of drainage. They further contend that this continuous inundation of their lands is a continuing tort, entitling them to compensation from the time that these lands initially became inundated in 1972.
On December 15, 1998, Plaintiffs filed an "Amending and Supplemental Petition," converting their action to a class action. By stipulation of the parties, the issues of liability and quantum were bifurcated.
On December 19, 2001, the class, which Plaintiffs represent, moved for a partial summary judgment, seeking a judgment on liability. They alleged that the DOTD's liability for their property loss arose out of its agreement to acquire all lands, servitudes, and right of ways "necessary for construction of the project and for its *321 subsequent maintenance, when and as required."
On December 12, 2002, the trial court rendered judgment, granting the Plaintiffs a partial summary judgment on liability. Specifically, it found that the DOTD had become the insurer of the United States under the "Act of Assurances" executed to facilitate this construction project and, as such, according to the provisions of the Louisiana Direct Action Statute,[1] the DOTD is liable for the damage to Plaintiffs' lands.
The DOTD appeals, complaining that the trial court erred: (1) when it held that the Plaintiffs' claims had not prescribed; (2) in ruling that it interfered with the Plaintiffs' servitudes of drainage and that such interference constitutes a continuous tort that prevents the prescription of Plaintiffs' claims; (3) in finding that it failed to meet its burden of proving the limits of the federal navigational servitude; (4) in holding that the "Act of Assurances" gives Plaintiffs a right of action against it; and (5) in finding that the DOTD previously stipulated to liability for similar claims and for concluding that these alleged stipulations are binding in this litigation and, in the alternative, in not finding that an issue of material fact exists regarding these stipulations.

* * *
STANDARD OF REVIEW
We review summary judgments de novo.[2] Thus, we ask the same questions the trial court previously asked in determining whether summary judgment is appropriate.[3] This inquiry seeks to determine whether any genuine issues of material fact exist and whether the movant is entitled to judgment as a matter of law.[4] Once the movant has made a prima facie showing that suggests we should grant the motion for summary judgment, the burden of production shifts to the nonmoving party to present evidence, demonstrating the existence of issues of material fact which preclude the granting of a summary judgment.[5]
PRESCRIPTION
The Plaintiffs brought this action against the DOTD to recover damages and injunctive relief for the permanent flooding of portions of their lands which the impingement of their servitude of drainage caused. However, the DOTD asserts that their claims have prescribed.
Louisiana Civil Code Article 667 provides, in part:
Although a proprietor may do with his estate whatever he pleases, still he cannot make any work on it, which may deprive his neighbor of the liberty of enjoying his own, or which may be the cause of any damage to him. However, if the work he makes on his estate deprives his neighbor of enjoyment or causes damage to him, he is answerable for damages only upon a showing that he knew or, in the exercise of reasonable care, should have known that his works would cause damage, that the damage could have been prevented by the exercise of reasonable care, and that he failed to exercise such reasonable care.
*322 "An action for damages for a violation of [La.Civ.Code art.] 667 is most closely associated with an action for damages based on [La.Civ.Code art.] 2315 et seq."[6] As such, a violation of Article 667 constitutes fault within the meaning of Article 2315.[7] Accordingly, our supreme court in Dean v. Hercules[8] held that any interference with a servitude is a violation of Article 667 which gives rise to a delictual action that prescribes in one year.[9]
Louisiana Civil Code Article 3493 provides:
When damage is caused to immovable property, the one year prescription commences to run from the day the owner of the immovable acquired, or should have acquired, knowledge of the damage.
In the instant case, the parties have stipulated that the Plaintiffs were aware of the inundation of their lands since 1972. Therefore, normally, their delictual action against the DOTD would have prescribed one year later.
Continuing Tort Theory
Nonetheless, the Plaintiffs assert that their compensation claims have not prescribed under the continuing tort theory since the cause of their injuries is continuous and leads to successive damages; thus, prescription will not begin to run until the wrongful conduct (the inundation of their lands) ceases. The DOTD retorts that these injuries were not of a continuous nature because the tortious conduct ceased in 1972 when the Corps completed construction.
To apply the continuing tort theory, the operating cause of the injury must be a continuous one that results in continuous damages.[10] Frank L. Maraist and Thomas C. Galligan, Jr., in their treatise on Louisiana tort law, clarified this requirement:
Ordinarily, the tortfeasor's act that causes damage is short-lived though the damage it causes may continue. In some cases, multiple, distinct acts by the tortfeasor cause separate and distinct damages; in those cases, each act gives rise to a separate tort, and prescription begins to accrue on each tort when the damage is sustained or at some later date, if the "discovery doctrine" applies. However, if both the tortious conduct and the damages continue, the tort may be deemed a "continuing" one and prescription may not begin to run until the wrongful conduct ceases.[11]
Therefore, if the operating cause of injury is tortious and continually gives rise to successive damages, prescription begins to run from the cessation of the particular wrongful conduct causing the damage.[12] "A continuing tort is occasioned by unlawful acts, not the continuation of the ill effects of an original, wrongful act."[13]
In this matter, because each instance of damage (each interference with *323 the servitudes of drainage) constitutes a tort under Article 667 and given Plaintiffs' belief that, both, the damage and interference are continuous, Plaintiffs assert that each of these torts qualifies as a continuing tort. We agree.
In Crump v. Sabine River Authority,[14] the supreme court had to determine whether the application of the continuing tort theory was appropriate. The plaintiff, Sarah Crump, objected to the digging of a canal that caused a diversion of the flow of water away from an oxbow, which, in turn, cut off her access to the Toledo Bend Lake from her property. She asserted that the defendant's contacts with her after this diversion of water took place and its repeated representations that it would resolve the water flow problem, as well as its unsuccessful attempts to do so, constituted continuous tortious conduct. The Crump court, however, concluded that it could not apply the continuing tort theory to the facts of that case because the complained of actions by the defendant were simply the continued ill effects that arose from a single tortious act, the digging of the canal. It further reasoned that:
[T]he defendant's duty to remove the canal would stem from its obligation under La. Civ.Code article 2315 to repair the damage caused by its tortious conduct. However, the breach of the duty to right a wrong and make the plaintiff whole simply cannot be a continuing wrong which suspends the running of prescription, as that is the purpose of any lawsuit and the obligation of every tortfeasor.
Unlike Crump, in the instant case, the continuous action that the Plaintiffs' complain of is the tortious conductthe constant interference with their servitudes of drainage, causing the permanent flooding of their lands. Actually, this case is more analogous to Estate of Patout v. City of New Iberia[15] and other cases, in which the courts held that debris and other objects placed on another's property constituted a continuing trespass (or a continuing tort) and, accordingly, prescription did not run until the trespass was abated.[16]
Likewise, prescription will not run in this case until the flooding of Plaintiffs' lands is abated. Therefore, we find, through application of the continuing tort theory, that prescription has not, yet, begun to run on their claims for compensation.
Louisiana Revised Statutes 13:5111
The DOTD argues that the one year prescriptive period for delictual actions is not applicable under these circumstances. Instead, it suggests that the three year prescriptive period for takings, which is apparently unaffected by the continuing tort theory, governs the Plaintiffs' claims. Specifically, it contends that the taking of property, by flooding or otherwise without proper exercise of eminent domain, is not a tort; rather, it is an appropriation by a governmental entity, subject to the three-year prescriptive period found in La.R.S. 13:5111, which provides, in part:
Actions for compensation for property taken by the state, a parish, municipality, or other political subdivision or any one of their respective agencies shall *324 prescribe three years from the date of such taking.
(Emphasis added.)
The court cannot supply the objection of prescription; a party must plead it.[17] The party pleading prescription has the burden of proving that the claim had prescribed.[18] We must strictly construe prescriptive statutes against prescription and in favor of the obligation that a party seeks to have extinguished.[19] Therefore, when there are two possible constructions, we should adopt the construction that favors maintaining, as opposed to barring, an action.[20]
A strict reading of La.R.S. 13:5111 leaves one no choice but to conclude that the three-year prescriptive period should only apply when it is "the state, a parish, municipality, or other political subdivision or any one of their respective agencies" taking the property. Even if we had any doubt whether this language encompassed takings by the United States, we could not alter our conclusion, given the mandate that we strictly construe ambiguous prescription statutes against prescription and in favor of the obligation sought to be extinguished.[21]
In a very similar case, an aggrieved landowner requested our supreme court to hold the City of Bogalusa, instead of the United States, as the appropriating authority responsible for the damage to her property.[22] The City of Bogalusa asked the United States to construct a navigable channel 50 to 100 feet wide and 6 to 9 feet deep in the Pearl River from the Rigolets to Bogalusa. The United States agreed to construct the proposed improvement to Pearl River with these stipulations:
(a) That local interests shall furnish, free of cost to the United States, the land required for the dams, locks, canal and appurtenances and all flowage and dumpage easements needed for initial construction and subsequent maintenance of the improvement and shall assume full responsibility for all property damage incident to construction and maintenance of the canal.
(b) That local interests shall give assurances satisfactory to the Secretary of War that they will provide, free of cost to the United States, the ferries and bridges required for land traffic across the lateral and terminal canals, and construct a terminal canal from Pearl River to and including a terminal basin at Bogalusa with suitable terminal facilities open to all on equal terms.[23]
In this resolution, the City of Bogalusa also guaranteed that it would "hold and save harmless the United States of America, and its agents, from all claims for damages that may or might result from the construction and maintenance of the improvement aforesaid."[24]
The landowner based her right to sue the city on this resolution, contending that the city assumed full responsibility for all the damages to her property incidental to *325 the construction of the canal. However, the supreme court found that she had no right of action against the city because the United States was the appropriating authority. It reasoned:
[T]he documents annexed to her petition and which necessarily control the allegations therein contained, show that the United States government was acting under its own constitutional rights in the exercise of the power belonging exclusively to it in improving a navigable river and that the dredging of the canal was incidental thereto.
If plaintiff has suffered damage, then the active and only agency causing the damage is the United States government. The work is solely under the direction and control of the United States government and title to the lands to be acquired, whether by purchase or condemnation, shall vest in the United States. The cost of the construction of the canal, locks, and dams is being paid by the United States. The supervision, operation, and maintenance of the finished project vests solely in the United States. The City of Bogalusa stands only in the position of being willing to pay whatever expenses or assessment the United States might incur in connection with the acquisition of the necessary right of way and such property damage as the owner might recover against the United States.[25]
For the same reasons, La.R.S. 13:5111 is inapplicable to the facts of this case since the United States' appropriation of Plaintiffs' lands, rather than the State's appropriation, led to the filing of this class action. Therefore, we disagree with the DOTD's assertion that the three-year prescriptive period for takings bars these claims.
We realize that this finding directly contradicts this court's holding in Hawthorne v. Louisiana Department of Public Works.[26] Nonetheless, strict application of La.R.S. 13:5111, together with the supreme court's reasoning in Cooper v. City of Bogalusa,[27] compels this result. Thus, given our belief that La.R.S. 13:5111 is inapplicable to the facts of this case, the general one-year prescriptive period for delictual actions governs Plaintiffs' claims for reimbursement.
Claims for Injunctive Relief
The Plaintiffs allege, and the DOTD concedes, that the Corps' construction of locks and dams along the Black and Ouachita Rivers obstructed the natural drainage of water from Plaintiffs' lands.
Louisiana Civil Code Article 655 acknowledges that "an estate situated below owes a natural servitude of drainage to an estate situated above and, thus, is bound to receive the surface waters that flow naturally from that estate."[28] Comment (a) to Article 655 provides: "This provision reproduces the substance of the first paragraph of Article 660 of the Louisiana Civil Code of 1870. It does not change the law. Louisiana jurisprudence interpreting Article 660 continues to be relevant." (Emphasis added.) Our legislature repealed Article 660 in 1977, which specifically referred to the situation before us: "The proprietor below is not at liberty to raise any dam, or to make any other work, to prevent this running of the water." (Emphasis added.)
*326 Thus, the law prohibits the owner of the servient estate from doing anything to prevent the natural flow of surface water from the dominant estate.[29] When the owner of the servient estate does something to prevent the flow of water, the remedy is a mandatory injunction, ordering the owner of the servient estate to remove any obstacles to natural drainage.[30]"The prescription of nonuse does not run against natural servitudes."[31] (Emphasis added.) Therefore, Plaintiffs' claims for injunctive relief to enforce their natural servitudes of drainage did not prescribe.[32]
Even though their claims for injunctive relief cannot prescribe, the DOTD contends that the trial court can order, only, the owner of the servient estate to remove obstacles to natural drainage. Thus, the DOTD maintains that trial court cannot order it to modify or remove the locks and dams that obstruct the Plaintiffs' servitude of drainage because the United States owns these structures. Essentially, the DOTD is alleging that the Plaintiffs' have no right of action against it.
NO RIGHT OF ACTION
The DOTD believes the trial court committed reversible error when it found that the "Act of Assurances" gave Plaintiffs a right of action against it since the uncontested facts clearly show that the United States owns, constructed, financed, and continues to manage the subject locks and dams that caused the inundation of their lands. On the other hand, the Plaintiffs argue that since the State agreed to use its inherent power of eminent domain to save the United States harmless against all claims arising out of the construction, maintenance, and operation of these locks and dams, the DOTD agreed to accept responsibility for their claims; thus, Plaintiffs can look to the DOTD for just and adequate compensation.
According to the "Act of Assurances," through the Rivers and Harbors Act, the United States agreed to build these locks and dams to promote navigation on the Ouachita and Black Rivers. As a condition to this agreement, Congress mandated that, first, the State must agree to furnish all lands, servitudes, and right-of-ways incident to the construction, maintenance, and operation of the project, and, second, it must indemnify and hold the United States harmless against all claims that might result from the construction of the channel.
The record clearly shows that the United States was acting under its own constitutional rights in the exercise of its power, which belongs exclusively to it, to improve navigable rivers.[33] Consequently, the only entity that caused the flooding of Plaintiffs' lands is the United States. The project was solely under the direction and control of the United States and title to the lands acquired, whether by purchase or condemnation, vested in the United States. It, also, paid all construction costs of the canal, locks, and dams. Moreover, the supervision, operation, and maintenance of the finished project are and have always been the sole responsibility of the United States. The DOTD is, merely, bound to pay any claims for damages, expenses, and assessments that the United States may have incurred involving the *327 acquisition of property and servitudes that were necessary for the project.
As such, the United States (the owner of the servient estate through which water runs) is bound to receive the natural drainage of surface waters that flow from the Plaintiffs' properties (the dominant estate).[34] The United States may make use of the water while it runs over its estate, but it "cannot stop it or give it another direction and is bound to return it to its ordinary channel where it leaves [the] estate." [35] Thus, the United States (as owner of the servient estate) cannot make the Plaintiffs' servitude more burdensome by obstructing the natural flow of water and, thus, it may be enjoined from doing so.[36]
However, since the United States is the operator and title owner of these locks and dams and given that it owns the land on which these constructions stand, we cannot enjoin the DOTD when it never had legal authority over these constructions and when it never owned the servient estate.[37] Under these circumstances, the United States is the only party we could enjoin, but it is not a party to this suit. Therefore, we must deny the Plaintiffs' request for injunctive relief, ordering the DOTD to remove these locks and dams that obstruct their servitude of drainage.
Nevertheless, even though the United States is primarily responsible for the inundation of Plaintiffs' lands, the DOTD is liable for any of the Plaintiffs' claims for reimbursement since it promised to hold and save the United States harmless for any loss or damages ensuing from the construction and maintenance of this project.
Direct Action Statute
The trial court agreed with the Plaintiffs' assertion that the "Act of Assurances" and hold harmless agreement, in essence, constituted an insurance contract and that, under this act of insurance, the Plaintiffs have a right of action against the DOTD, as the "responsible state agency" and insurer under the act. Its reasoning is based on language in the Direct Action Statute,[38] which gives third parties to an insurance contract a direct right of action against a tortfeasor's liability insurance carrier.
Under this statute, an injured third party's right of action against the liability insurer vests at the time of injury.[39] Therefore, Plaintiffs urge that their right of action would have vested in 1972 when the Corps completed construction of the project.
In 1972, the Direct Action Statute, which is a part of the Insurance Code, provided, in part:
The injured person or his or her survivors or heirs hereinabove referred to, at their option, shall have a right of direct action against the insurer within the terms and limits of the policy; and such action may be brought against the insurer alone, or against both the insured and insurer jointly and in solido, *328 in the parish in which the accident or injury occurred or in the parish in which an action could be brought against either the insured or the insurer under the general rules of venue prescribed by Art. 42, Code of Civil Procedure.
(Emphasis added.) In its written reasons for judgment, the trial court specifically addressed the Plaintiffs' contention that the "Act of Assurances" is an insurance policy which the Direct Action Statute governed:
The "Act of Assurance[s]" executed by the State in favor of the United States is a simple two page document and under its provisions the State assures all damages for the construction and maintenance of the locks and dams constructed. The word indemnity is not used in the document. It is, however, unclear whether the contract is one of insurance or indemnity. The agreement merely provides [that the State will]: "Hold and save the United States free from damages due to construction and maintenance of the project." Blacks Law Dictionary defines "insurance" as:
A contract whereby, for a stipulated consideration, one party undertakes to compensate the other for loss on a specified subject by specified perils. The party agreeing to make the compensation is usually called the "insurer" or "underwriter," the other, the "insured" or "assured;" the agreed consideration, the "premium;" the written contract, a "policy;" the events insured against, "risks" or "perils;" and the subject, right, or interest to be protected, the "insurable interest."
Under this definition the "Act of Assurance[s]" executed by the State would constitute insurance, and as such fall under the Direct Action Statute.
(Emphasis added.)
In support of its conclusion that the DOTD became the liability insurer of the United States under the "Act of Assurances," the trial court quoted Quinlan v. Liberty Bank & Trust Company:
Unless the parties to the insurance contract have agreed unambiguously that the contract shall be an indemnity contract only, it would be inequitable to deny an innocent tort victim the right to bring a direct action against the insurer, even if he has sustained only loss or damage to an incorporeal.[40]
Without any such unambiguous declaration in the "Act of Assurances," expressly stating that it is an indemnity contract, the trial court reasoned that the DOTD is obligated to act as the United States' liability insurer.
In 1972, the definitions section of the Insurance Code, La.R.S. 22:5 contained the following applicable provisions:
In this Code, unless the context otherwise requires, the following definitions shall be applicable:
(1) "Insurance" is a contract whereby one undertakes to indemnify another or pay a specified amount upon determinable contingencies.
(2) "Insurer" includes every person engaged in the business of making contracts of insurance, other than a fraternal benefit society. A reciprocal, an inter-insurance exchange, or a Lloyds organization is an "insurer."
....
(6) "Person" means any individual, company, insurer, association, organization, reciprocal or inter-insurance exchange, *329 partnership, business, trust, or corporation.
(Emphasis added.) Clearly, the state and its respective agencies were not designated as insurers under La.R.S. 22:5(2).[41] Therefore, the trial court improperly deemed the DOTD as an insurer of the United States and, as such, the application of the Direct Action Statute to this matter is not feasible.
Given the inapplicability of the Direct Action Statute, we must determine if an alternate theory would allow the Plaintiffs to bring this action directly against the DOTD. Louisiana Code of Civil Procedure Article 862 mandates that "a final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings and the latter contain no prayer for general and equitable relief." (Emphasis added.) Because Louisiana is a fact pleading state, a plaintiff must state the facts of their claim, but they do not have to set forth every possible theory of recovery.[42]
Indemnification Agreement v. Suretyship
The Cooper court,[43] when faced with a very similar predicament, held that the plaintiff property owner did not have a right to bring a direct action against the City of Bogalusa, the local indemnifying authority, for the damages to her property that resulted from a navigation project solely under the United States' control. Specifically, it held that the city's assurance to hold the United States harmless was in the nature of an indemnification agreement rather than one of suretyship.
Louisiana Civil Code Article 3035 defines suretyship as follows:
Suretyship is an accessory contract by which a person binds himself to a creditor to fulfill the obligation of another upon the failure of the latter to do so.
A surety is liable to the creditor for the full performance of the obligation of the principal obligor, without benefit of division or discussion, even in the absence of an express agreement of solidarity.[44] A promise of suretyship need not contain technical formalities, but it must contain a clear expression of a party's intent to be bound as a surety.[45]
The plaintiff in Cooper believed the resolutions, to which the City of Bogalusa had agreed, established for it a suretyship obligation.[46] Accordingly, she alleged that the city was acting as a surety for the United States and, as such, the city was solidarily liable for the damage to her property which the United States' construction of a navigable channel in the Pearl River caused.[47] Our supreme court, however, found that these resolutions were, merely, evidence of an indemnification agreement between the city and the United States.[48] Therefore, it held that the plaintiff did not have a direct right of action against the city because its agreement to reimburse the United States for the damages it incurred due to the maintenance and construction *330 of the channel did not make the City of Bogalusa a solidary obligor.[49]
Considering that the resolutions in Cooper are almost identical in substance to the "Act of Assurances" at issue in this matter, we conclude that the DOTD merely I agreed to indemnify the United States in the "Act of Assurances" and, thus, never agreed to act as its surety.[50]
Third Party Beneficiaries
Notwithstanding, this indemnification agreement between the United States and the DOTD created a stipulation pour autrui in favor of the Plaintiffs who are third party beneficiaries to the "Act of Assurances."[51]
A stipulation made in favor of a third party beneficiary (a stipulation pour autrui) gives a third party the right to demand performance from the promisor.[52] Our courts have consistently recognized the beneficiary's right to demand performance from the promisor, directly.[53]
Our law favors stipulations made in favor of third persons.[54] The supreme court in Andrepont v. Acadia Drilling Company enumerated factors for us to consider when deciding whether a contract provides a benefit for a third person:
(1) The existence of a legal relationship between the promisee and the third person involving an obligation owed by the promisee to the beneficiary which performance of the promise will discharge;
(2) the existence of a factual relationship between the promisee and the third person, where (a) there is a possibility of future liability either personal or real on the part of the promisee to the beneficiary against which performance of the promisee [sic] will protect the former; (b) securing an advantage for the third person may beneficially affect the promisee in a material way; (c) there are ties of kinship or other circumstances indicating that a benefit by way of gratuity was intended.[55]
When we apply these factors to the facts of this case, the legal relationship between the promisee (United States) and the third persons (Plaintiffs) involves an obligation (to reimburse the Plaintiffs for the permanent flooding of their land caused by the construction and maintenance of the locks and dams along the Ouachita and Black Rivers) owed by the promisee (United States) to the beneficiaries (Plaintiffs) which performance of the promise (to "[f]urnish free of cost to the United States all lands, easements, and right of way[s], including flowage rights in overflow areas, and suitable spoil-disposal areas necessary for construction of the project and for its subsequent maintenance, when and as required" and to "[h]old and save the United States free from damages due to construction and maintenance of the project") by the promisor (DOTD) would discharge.[56]
In other words, the obligation that the United States imposed as a condition of the "Act of Assurances" and undertaken *331 by the DOTD (to provide the United States with all lands and servitudes necessary for the construction and maintenance of the locks and dams along the Ouachita and Black Rivers) constitutes a stipulation pour autrui in favor of the Plaintiffs.[57] The inference is clear that the United States knew before it constructed these locks and dams that it needed to acquire multiple pieces of property and servitudes to carry out this massive construction project. As such, it was interested in having the DOTD undertake its obligation to compensate the Plaintiffs if construction resulted in the taking of their lands because, otherwise, the United States would be responsible for paying their claims for reimbursement.
In addition, the relationship between the United States and the Plaintiffs was sufficient to support the inference that there was a possibility that the United States could be liable to the Plaintiffs sometime in the future, but performance of the DOTD's promise would protect the United States. This possibility of future liability (for the damaging or taking of land caused by the construction of these locks and dams) stems from the very obligation that the United States wanted discharged. Therefore, this case fits squarely within the guidelines our supreme court set for determining when claimants should receive third-party beneficiary status.
The fact that the parties did not specifically name the Plaintiffs in the "Act of Assurances" as third party beneficiaries is of no consequence because our jurisprudence recognizes that parties to a contract may make a stipulation pour autrui in favor of undetermined persons.[58] Moreover, the law does not require express acceptance or consent by third party beneficiaries, nor does it require a particular form of acceptance or consent.[59] Comment (b) to La.Civ.Code art. 1978 states that "the beneficiary's intention to accept the benefit may be made known in any manner, even implied." Thus, by simply filing suit, the Plaintiffs made known their intention to accept the benefit.[60]
Consequently, we find that the Plaintiffs have a right to proceed directly against the DOTD for the damages arising out of the breach of its promise to the United States to provide it, free of claims, with all lands and servitudes necessary for the construction and maintenance of the locks and dams along the Ouachita and Black Rivers.
Recovery in Tort
Under some circumstances, a third party beneficiary can look beyond this contract theory for recovery.[61] Thus, when a party's damage arises from the breach of a contractual relationship, he or she may have a remedy both in contract and in tort.[62] Therefore, the same acts or omissions may constitute a breach of both a general duty owed to all persons (ex delicto) and a breach of a special obligation the obligor contractually assumed *332 (ex contractu).[63] Thomas C. Galligan, Jr. acknowledged:
One readily sees the relationship between tort recovery in such cases and third party beneficiary recovery in contract cases or obligations. However, as we have seen, the third party beneficiary theory may not be the only available means of recovery; tort causes of action may be available as well.[64]
Louisiana Civil Code Article 2315 provides, in part: "Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." In other words, every action, even if lawful, must be conducted with due regard for the rights of others.[65] A party is at fault when they breach a duty owed to another under the particular facts and circumstances of a given case.[66] Fault encompasses the exercise of contractual rights in a manner that causes unreasonable property damage.[67] As such, the assumption of a contractual duty may create a corollary or incidental tort duty in favor of third persons.[68] Professor Glenn G. Morris explains further:
A tort duty is a duty that society imposes on a person, without his consent, in order to protect other persons from harm to certain legally protected interests. If a person causes damage by breaching a tort duty owed to the plaintiff, then, absent immunity, he is personally liable to the plaintiff for those damages. The fact that he may have agreedin a contract or otherwiseto commit the tort on behalf of someone else (or, more realistically, to have agreed to engage in the conduct giving rise to the risk of injury against which the duty involved is designed to protect) is a matter that is irrelevant to his own liability. While the person for whom he was acting may also be held liable under appropriate circumstancesif, for example, he had the requisite control and economic relationshipthe fact that someone else may be held ... liable for the tort does not eliminate the liability of the tortfeasor himself....
....
It is important to understand, however, that even though the duty involved would be factually related to the contract, it would be legally distinct from and independent of that contract. Indeed, it really would not matter whether the situation was created by a contract that was enforceable as suchas a legal contractor whether by some other form of consensual undertaking.... Thus, if the contract happened to be unenforceable ... the tort duty would arise nevertheless. That would be so because the source of the duty involved would not be the contract itself, but rather society's interests in protecting its members against uncompensated ... injury.[69]
*333 Considering the foregoing, we hold that the DOTD's obligation to reimburse Plaintiffs arises each time the United States' interferes with their natural servitudes of drainage. Since each instance of damage (each interference with Plaintiffs' servitudes of drainage) constitutes a new tort under Article 667 and given that, both, the damage and interference are continuous, each of these torts qualifies as a continuing tort. Therefore, the Plaintiffs can proceed directly against the DOTD for its failure to reimburse them for the permanent flooding of their lands which the continuous interference with their servitudes of drain has caused. This direct action by the Plaintiffs, the parties who suffered the ultimate loss, "against the party ultimately responsible for it avoids the multiplicity and circuitry of action otherwise necessary to achieve the payment of the loss to [those] who suffered it by the one who caused it."[70] In other words, permitting this direct action against the DOTD, under these limited circumstances, promotes judicial economy by not requiring the Plaintiffs to, first, file an action against the Federal Government, which would, in turn, be filed against the DOTD.
FEDERAL NAVIGATIONAL SERVITUDE
The DOTD maintains that all of the Plaintiffs' inundated lands fall within and are subject to the federal navigational servitude. If this superior navigational servitude extends to these inundated lands, neither the United States nor the DOTD can be held liable for any damage this construction project, designed to promote navigation on Black and Ouachita Rivers, caused.
The federal navigational servitude arises by virtue of the Commerce Clause in navigable waters, but it does not extend to all navigable waters.[71] This servitude recognizes the public's interest in using waterways as continuous highways for the purpose of navigation.[72] However, this interest is not absolute and the imposition of this servitude is not automatic.[73]
The only evidence the DOTD presented at trial to support its contention that the Plaintiffs' lands were subject to the federal navigational servitude was the self-serving testimony of Merlin A. Pistorious, an engineer for the DOTD. According to Mr. Pistorious, the Corps did not instruct the DOTD to purchase any property or servitudes in the area of the Jonesville Pool because it assumed that this property was subject to the federal navigational servitude. Specifically, he stated:
A. The Corps of Engineers provided us with drawings and maps indicating to us where these right-of-ways would have to be acquired. In the Jonesville Pool, we were not required or given any drawings showing that we had to acquire easements or right-of-ways for flowage.
Q. And why not?
A. Because of the raising of the pool. Well, the explanation that I was givenand I came onto this project in 1972and bear in mind the Jonesville Lock and Dam had already been constructed when I came into this area, but in conversations with Corps of Engineers' right-of-way and real estate employees and with superiors within my department, I was informed that the Corps had *334 always maintained that we would not require flowage easements ... in the Jonesville Pool because all of the lands that would be inundated by the permanent pool fell within the navigation servitude ... and therefore did not require the taking of any new rights.
(Emphasis added.)
The DOTD believes Mr. Pistorious' unrefuted testimony is enough to defeat the Plaintiffs' motion for summary judgment. However, the burden of proving navigability rests upon the party asserting it.[74] Therefore, considering the fact that the permanently flooded portions of Plaintiffs' lands were along Rawson Creek, Gastis Creek, Dry Lake, Hooter Creek, Big Creek, and Oil Well Creek and the absence of evidence regarding their navigability, we must consider these waterways to be non-navigable for the purposes of the present case.[75]
In Goose Creek Hunting Club, Inc. v. United States,[76] the court explained further:
[I]f ... an improvement on a navigable stream raises the water level in the stream and thereby damages privately owned property situated within the bed of the stream, the Government is not liable for the ensuing damages. This is because privately owned property situated within the bed of a navigable stream is always subject to the Government's dominant servitude in the interest of navigation.
....
On the other hand, the navigational servitude of the Government does not extend beyond the beds of navigable streams; and if an action taken by the Government to improve the navigability of a navigable stream raises the water level in the stream and thereby causes it to overflow or otherwise damage property situated outside the bed of such stream, the Government is liable for the ensuing damages.
(Emphasis added.)
Accordingly, even if the DOTD's assertion that the Black and Ouachita Rivers are navigable streams, subject to the federal navigational servitude, is correct, the Plaintiffs' inundated lands are not subject to this servitude because their lands are situated beyond the beds of those rivers.[77] As such, the DOTD's contention that Mr. Pistorious' testimony proves the Plaintiffs' inundated lands were subject to the federal navigational servitude is without merit.
PRIOR STIPULATIONS TO LIABILITY
The DOTD asserts that the trial court erroneously concluded that it previously stipulated to liability for similar claims in prior proceedings. The DOTD, also, believes the trial court improperly held that those stipulations were binding in this litigation.
We will not address this assignment of error because these alleged stipulations were not a factor that affected our findings in any way.
Accordingly, we must conclude that the DOTD is liable for the permanent flooding of Plaintiffs' lands which the United States' construction of locks and dams along the Black and Ouachita Rivers caused. We, also, find that the Plaintiffs had the right to bring this action directly against the DOTD to recover damages for *335 the United States' appropriation of their lands. Although, given that the DOTD is not the owner of the servient estate, we cannot grant the Plaintiffs' request for injunctive relief.

CONCLUSION
We affirm the trial court's judgment, granting the Plaintiffs a partial summary judgment on liability. Further, we conclude that they have a direct right of action against the DOTD to recover damages for the inundation of their lands, but we deny their request for injunctive relief. We assess all costs of this appeal to the DOTD.
AFFIRMED.
PICKETT, J., dissents.
NOTES
[*] Judge Arthur J. Planchard, Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] La.R.S. 22:655.
[2] Magnon v. Collins, 98-2822 (La.7/7/99), 739 So.2d 191.
[3] Thompson v. McKnight, 01-190 (La.App. 3 Cir. 6/6/01), 787 So.2d 620, writ denied, 01-2882 (La. 1/25/02), 807 So.2d 249.
[4] La.Code Civ.P. art. 966(B).
[5] Hayes v. Autin, 96-287 (La.App. 3 Cir. 12/26/96), 685 So.2d 691, writ denied, 97-281 (La.3/14/97), 690 So.2d 41.
[6] Dean v. Hercules, Inc., 328 So.2d 69, 72 (La. 1976).
[7] Id.
[8] Id.
[9] La.Civ.Code. art. 3492.
[10] Crump v. Sabine River Auth., 98-2326 (La.6/29/99), 737 So.2d 720; Bustamento v. Tucker, 607 So.2d 532 (La. 1992); S. Cent. Bell Tel. Co. v. Texaco, Inc., 418 So.2d 531 (La. 1982).
[11] FRANK L. MARAIST & THOMAS C. GALLIGAN, JR., LOUISIANA TORT LAW § 10-4(e) (2001) (citations omitted).
[12] S. Cent. Bell Tel. Co., 418 So.2d 531; Crump, 737 So.2d 720.
[13] Crump, 737 So.2d at 728.
[14] Id.
[15] 97-1097 (La.App. 3 Cir. 3/6/98), 708 So.2d 526, writ granted, 98-961 (La.7/2/98), 721 So.2d 897, affirmed by, 98-961 (La.7/7/99), 738 So.2d 544.
[16] See Dore v. Jefferson Guar. Bank, 543 So.2d 560 (La.App. 4 Cir.1989). See also Terral v. Poole, 484 So.2d 227 (La.App. 3 Cir. 1986).
[17] La.Code Civ.P. art. 927; La.Civ.Code art. 3452.
[18] Pearson v. Hartford Accident & Indem. Co., 281 So.2d 724 (La. 1973).
[19] See Unlimited Horizons, LLC v. Parish of E. Baton Rouge, 99-889 (La.App. 1 Cir. 5/12/00), 761 So.2d 753.
[20] See Id.
[21] See State ex rel. Guste v. Simoni, Heck & Assoc., 331 So.2d 478 (La. 1976).
[22] Cooper v. City of Bogalusa, 195 La. 1097, 198 So. 510 (1940).
[23] Id. at 511.
[24] Id.
[25] Id. at 512.
[26] 540 So.2d 1261 (La.App. 3 Cir.), writ denied, 544 So.2d 406 (La. 1989).
[27] 198 So. 510.
[28] La.Civ.Code art. 655.
[29] La.Civ.Code art. 656.
[30] Gaharan v. State of La., Through the DOTD, 579 So.2d 420 (La.1991).
[31] La.Civ.Code art. 758.
[32] Gaharan, 579 So.2d 420.
[33] See Cooper, 198 So. 510.
[34] La.Civ.Code art. 655; La.Civ.Code art. 658.
[35] La.Civ.Code art. 658.
[36] Gravity Drainage Dist. v. Vallee, 512 So.2d 473 (La.App. 3 Cir.), writ denied, 513 So.2d 820 (La.1987); La.Civ.Code art. 655; La.Civ. Code art. 656.
[37] See Carbo v. City of Slidell, 01-170 (La. App. 1 Cir. 1/8/03), 844 So.2d 1, writ denied, 03-392 (La.4/25/03), 842 So.2d 400; See also Robertson v. Lebermuth, 132 La. 318, 61 So. 388 (1913).
[38] La.R.S. 22:655.
[39] King v. King, 253 La. 270, 217 So.2d 395 (1968).
[40] 575 So.2d 336 (La.1990).
[41] Nelson v. Cont'l Cas. Co., 412 So.2d 701 (La.App. 2 Cir.), writ denied, 413 So.2d 507 (La.1982).
[42] State ex rel. Ieyoub v. Racetrac Petroleum, Inc., 01-458 (La.App. 3 Cir. 6/20/01), 790 So.2d 673.
[43] 198 So. 510.
[44] La.Civ.Code art. 3045.
[45] Ball Mktg. Enter, v. Rainbow Tomato Co., 340 So.2d 700 (La.App. 3 Cir. 1976).
[46] Cooper, 198 So. 510.
[47] Id.
[48] Id.
[49] Id.
[50] See Id.
[51] See La.Civ.Code art. 1978.
[52] La.Civ.Code art. 1981.
[53] Comment to La.Civ.Code art. 1981.
[54] Andrepont v. Acadia Drilling Co., 255 La. 347, 231 So.2d 347 (1969).
[55] Id. at 351 (citing Smith, Third Party Beneficiaries in Louisiana: The Stipulation Pour Autrui, 11 TUL.L.REV. 18, 58 (1936)).
[56] See Id.
[57] Id.
[58] Id.; Hazelwood Farm, Inc. v. Liberty Oil & Gas Corp., 01-345 (La.App. 3 Cir. 6/20/01), 790 So.2d 93, writ denied, 01-2115 (La.7/26/01), 794 So.2d 834, writ denied, 01-2303 (La.8/10/01), 794 So.2d 836; Dartez v. Dixon, 502 So.2d 1063 (La. 1987).
[59] Hazelwood Farm, Inc., 790 So.2d 93; Andrepont, 231 So.2d 347.
[60] See Comment (b) to La.Civ.Code art. 1978. See also Andrepont, 231 So.2d 347.
[61] Barrie v. V.P. Exterminators, 625 So.2d 1007 (La. 1993).
[62] Corbello v. Iowa Prod., 02-826 (La.2/25/03), 850 So.2d 686; Fed. Ins. Co. v. Ins. Co. of N. Am., et al., 262 La. 509, 263 So.2d 871 (1972).
[63] Fed. Ins. Co., 263 So.2d 871; Davis v. LeBlanc, 149 So.2d 252 (La.App. 3 Cir.1963); United Gas Pipe Line Co. v. Cargill, Inc., 612 So.2d 783 (La.App. 1 Cir.1992).
[64] Thomas C. Galligan Jr., Contortions Along the Boundary Between Contracts and Torts, 69 TUL. L.REV. 457, 525 (1994).
[65] Broussard v. Northcott Exploration Co., 481 So.2d 125 (La. 1986).
[66] Id.
[67] Id.
[68] Smith v. State, 620 So.2d 1172 (La.App. 1 Cir.1992). See Barrie, 625 So.2d 1007. See also Broussard, 481 So.2d 125.
[69] Glenn G. Morris, Developments in the Law: Business Associations, 50 LA.L.REV. 211, 220-21 & 224 (1989) (citations omitted).
[70] State ex rel. Guste, 331 So.2d at 484.
[71] Dardar v. Lafourche Realty Co., Inc., 985 F.2d 824 (5th Cir.La. 1993).
[72] Id.
[73] Dardar v. Lafourche Realty Co., 55 F.3d 1082 (5th Cir.La.1995).
[74] Goose Creek Hunting Club, Inc. v. United States, 518 F.2d 579, 207 Ct.Cl. 323 (1975).
[75] See Id.
[76] Id. at 330-31, 518 F.2d 579.
[77] See Id.